UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Respondent, | ) |
| | ) |
| v. | ) Case No. 2:17-cr-20049-SLD-EIL |
| | ) |
| RANDY WILLIAMS, | ) |
| | ) |
| Defendant-Petitioner. | ) |

ORDER

Before the Court are Defendant-Petitioner Randy Williams's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("2255 Motion"), ECF No. 86, and Amended Motion to Set Aside Conviction Pursuant to 28 U.S.C. Section 2255 and Memorandum of Law in Support ("Amended Motion"), ECF No. 123. For the reasons that follow, the 2255 Motion is MOOT IN PART, and the Amended Motion is DENIED.

**BACKGROUND**

The Court presumes familiarity with its March 29, 2024 Order, ECF No. 113, and repeats only what is necessary to resolve the pending motions. In the March 29, 2024 Order, the Court denied some grounds of ineffective assistance of counsel raised in the 2255 Motion but reserved ruling on others. *Id.* at 19–20. The Court appointed counsel for Williams and granted leave for counsel to file an amended motion under § 2255. *Id.* at 20. The Amended Motion was filed in January 2025, and reiterates only a subset of the remaining bases of ineffective assistance of counsel from the 2255 Motion: first, that trial counsel David Rumley failed to cross-examine a detective regarding a prior statement he made; second, that Rumley failed to object to the Government's prosecutorial misconduct in closing; third, that Rumley "fail[ed] to impeach"

1

Jaevontae Williams ("Jaevontae") with Thomas James's conflicting testimony;[1] and fourth, that Rumley "fail[ed] to impeach blatant flaws in [Jaevontae]'s testimony." Am. Mot. 3, 11–18. The Government argues that Williams's "claims of error are not borne out upon review of the record." Resp. Am. Mot. 1, ECF No. 124. It also argues that Williams has waived any claims that the Court left pending in the March 29, 2024 Order that were not reraised in the Amended Motion. *See id.* at 6 n.4. Williams filed a reply responding to the Government's arguments about the four claims contained in the Amended Motion. *See generally* Reply, ECF No. 125.

## DISCUSSION

### I. Legal Standards

A prisoner in federal custody may move the court that imposed his sentence to vacate, set aside, or correct it. 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Accordingly, such relief "is available only when the 'sentence was imposed in violation of the Constitution or laws of the United States,' the court lacked jurisdiction, the sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral attack." *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (quoting 28 U.S.C. § 2255(a)).

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. U.S. Const. amend. VI. Claims of ineffective assistance of counsel are subject to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). This test requires a

---

[1] The summary paragraph actually states that Rumley failed to impeach James with Jaevontae's testimony and failed to impeach flaws in James's testimony, Am. Mot. 3, but the Court understands those to be typographical errors, *see id.* at 11–18.

2

defendant to show that his counsel's performance "fell below an objective standard of reasonableness" and that he suffered prejudice as a result. *Id.* at 688, 692. The court applies "a strong presumption that decisions by counsel fall within a wide range of reasonable trial strategies." *United States v. Shukri*, 207 F.3d 412, 418 (7th Cir. 2000) (quotation marks omitted). The defendant "must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). To demonstrate prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**II.    Analysis**

Initially, the Court holds that only the four bases of ineffective assistance of counsel alleged in the Amended Motion are before it. Nothing in the Amended Motion suggested it was intending to incorporate any additional claims from the *pro se* 2255 Motion. And Williams made no argument in response to the Government's waiver argument, suggesting he did not intend to preserve those claims. The Amended Motion replaced what remained of the original 2255 Motion after the Court's March 29, 2024 Order. *Cf. Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004) ("It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void."). Accordingly, what remained of the 2255 Motion is MOOT.

a. **Detective Bednarz**

Williams's first argument is that Rumley provided ineffective assistance of counsel by "failing to cross-examine Detective Jim Bednarz regarding his prior statement in State Court."

3

Am. Mot. 3.  A short recitation of the facts relevant to this claim is warranted.  Williams was charged with Hobbs Act robbery arising out of an armed robbery of a Sprint store.  *See* Mar. 29, 2024 Order 2.  James and Andrew Nunn entered the store "with a gun, threatened and zip-tied all witnesses, grabbed some merchandise, and fled the store in two vehicles."  *Id.* (quoting *United States v. Williams*, 949 F.3d 1056, 1058 (7th Cir. 2020)).  They stole an iPhone from Kasey Coleman.  *See* Trial Day 1 Tr. 59:13–18, ECF No. 72; *id.* at 61:11–12.  After police arrived, Coleman logged into his account on a store computer in order to use the Find My iPhone function.  *See id.* at 61:12–62:1.  Through this, the police were able to see that Coleman's phone was traveling northbound on I-57 approaching Paxton, Illinois.  *Id.* at 62:10–15.  Police were informed by another witness that the robbers had left in a two-door gray car.  *See id.* at 62:16–17; *id.* at 113:13–17.  Illinois State Police officers stopped a car matching that description near the identified location.  *See id.* at 113:11–114:7.  It was a gray Monte Carlo; Williams was the driver, and Jaevontae was a passenger.  *See* Trial Day 2 Tr. 177:22–178:20, ECF No. 73; *id.* at 181:3–12.  Illinois State Police officers found a few phones in the car.  *See* Trial Day 1 Tr. 116:23–117:1.  One of the officers at the Sprint store called Coleman's phone, and it rang in the Monte Carlo.  *See id.* at 117:20–119:3.

After the robbery, Detective Bednarz obtained a warrant to collect Williams's DNA.  Search Warrant, Am. Mot. Ex. A, ECF No. 123-1 at 1.  In the affidavit in support of the search warrant, Bednarz stated that he reviewed surveillance footage from outside the Sprint store.  Compl. & Aff. for Search Warrant 2, Am. Mot. Ex. A, ECF No. 123-1 at 2–4.  He stated that the video depicted two black males enter the store and then later exit the store "carrying a large black plastic bag."  *Id.*  Bednarz further stated that the "two black males match the description of the two suspects from the ARMED ROBBERY."  *Id.*  Williams was charged with aggravated

4

and armed robbery in state court. *See* Informations, Am. Mot. Ex. B, ECF No. 123-2. The armed robbery charge alleged that Williams "took property, namely a cell phone, from the person of . . . Coleman by the threat of force" and that Williams "was armed with a firearm." *Id.* These charges were later dropped when Williams was indicted on the instant federal charge.

Williams asserts that based on Bednarz's statement that the men who entered the Sprint store matched the descriptions of the suspects and the state alleging that Williams was armed with a firearm during the robbery, it is clear that "Bednarz and the Champaign County State's Attorney's Office . . . believed [Williams] was the gunman." Am. Mot. 5. Bednarz testified at Williams's federal trial, by contrast, that he did not see Williams on any of the surveillance footage, Trial Day 2 Tr. 73:12–16, and that he had at some point after viewing the footage identified the two individuals who entered and exited the Sprint store as James and Nunn, *id.* at 53:17–22. Williams contends that "any reasonable attorney would have tested Detective Bednarz's credibility using the prior inconsistent statement at State Court." Am. Mot. 6.

As an initial matter, the Court is not convinced that Williams has identified a prior inconsistent statement.[2] He is relying on Bednarz's statement in the affidavit that the "two black males" seen leaving the store on the video footage "match the description of the two suspects from the ARMED ROBBERY." Compl. & Aff. for Search Warrant 2. The Court understands this to mean that the two men seen on the video footage match the descriptions of the robbers given by two witnesses to the crime. *See id.* at 1–2 (stating that two witnesses from inside the store, Ryan Doebel and Natasha Austin, saw two suspects enter the store and reciting the

---

[2] In the briefing on the *pro se* 2255 Motion, Williams argued that Bednarz had made an inconsistent statement at his state court preliminary hearing. *See* Reply 2255 Mot. 5–6, ECF No. 100. Williams provided the transcript of the preliminary hearing, *see* Prelim. Hr'g Tr., ECF No. 102, at which Bednarz did testify that he "was able to identify Randy Williams, based on his likeness within the" surveillance video Bednarz reviewed, *id.* at 11:15–18. It is not clear why counsel did not focus on this statement, which is far closer to being inconsistent.

descriptions of the suspects given by Doebel and Austin).[3] That is not inconsistent with Bednarz's testimony at the federal trial.

Even if Bednarz had made an inconsistent statement and even if it could be considered deficient performance not to cross-examine, impeach, or otherwise cast doubt on Bednarz's credibility based on that inconsistent statement, Williams cannot establish that he received ineffective assistance of counsel because he fails to demonstrate that there is a reasonable probability the outcome of the trial would have been different had Rumley so challenged Bednarz. Bednarz did not testify as an eyewitness. He was "the detective . . . on call the night of" the armed robbery at the Sprint store. Trial Day 2 Tr. 42:25–43:4. He primarily served as a foundation witness so that the Government could admit and publish a recording of an interview of Williams, *see id.* at 44:6–49:10, and the surveillance camera footage of the Sprint store, *see id.* at 50:9–61:5. Bednarz also testified that he used Google Maps to determine whether Williams's excuse for being in the area he was pulled over in—that his pregnant girlfriend was in labor "so he left Kankakee and drove down to Hoopeston, Illinois, to visit her" but no one was at her apartment so he "started to head back to Kankakee where [he was] pulled over"—was plausible. *See id.* at 47:14–24; *id.* at 67:20–71:1. In Bednarz's estimation, it was not. *See id.* at 71:3–7.

The majority of the evidence introduced during Bednarz's testimony was evidence the jurors could observe and assess themselves—Williams's statements in the interview, the surveillance footage, and the images and maps of the locations referenced in Williams's alibi story. Even if the jury thought Bednarz was not credible, it is unlikely they would have discounted any of that evidence. Williams's argument on prejudice is that showing that Bednarz had initially identified the wrong gunman would create "a reasonable probability that the jury

---

[3] It would be odd to say the men on the video matched the descriptions of Williams and Jaevontae, whose descriptions had not been provided in the affidavit.

would not see the Government's experts as authoritative," and accordingly, the outcome could have been different because "the Government's case heavily relied on a parade of experts who could not pinpoint [William's] involvement but hoped to create the impression that" he was involved. Am. Mot. 7–8. But Bednarz did not testify as an expert, so the argument has a faulty premise. Even if Bednarz had been an expert, Williams is merely speculating that: 1) the jury would have found Bednarz not credible; 2) the jury would have imputed that lack of credibility to other Government witnesses; and 3) the distrust of the Government's witnesses would have caused jurors to find him not guilty. This speculation is insufficient to establish a reasonable probability that the verdict would have been different. *See Magee v. Smith*, 403 F. App'x 84, 86 (7th Cir. 2010) ("The prejudice prong requires something beyond speculation that the jury verdict may have been tainted by counsel's deficiency."); *Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").

    b. **Prosecutorial Misconduct During Closing Arguments**

Williams's second argument is that Rumley provided ineffective assistance of counsel "by failing to object to the Government's prosecutorial misconduct during the Government's closing argument." Am. Mot. 8. This argument was raised in the 2255 Motion and the Court found that some of the alleged misconduct clearly did not deprive Williams of a fair trial but reserved ruling on the remainder. *See* Mar. 29, 2024 Order 11–13. The version of the claim reasserted in the Amended Motion focuses on the following statements from the Government's closing argument: first, "If there's a smoking gun here, ladies and gentlemen, it's Government's Exhibit 11. There's no explanation for why this phone is next to that man less than an hour from the robbery. No explanation for that," Trial Day 3 Tr. 172:8–12, ECF No. 74; and second, "If

7

there was any legitimate explanation for why this phone was next to this man an hour from the robbery, you would have heard it. Find him guilty," *id.* at 175:6–9. Williams argues that these statements were indirect comments on his failure to testify that infringed on his Fifth Amendment right to remain silent and, further, that any reasonable attorney would have objected to the statements. Am. Mot. 9–10. The Government disputes that these statements violated the Fifth Amendment, Resp. Am. Mot. 15–16, but argues that even if they did, "Williams cannot establish that he suffered any prejudice under the second prong of *Strickland*" because "[t]he weight of the evidence against [him] was strong," *id.* at 17.

Claims of prosecutorial misconduct based on allegedly improper remarks are analyzed in two steps. First, the court considers "whether the remarks by the prosecutor were improper when viewed in isolation." *United States v. Carswell*, 996 F.3d 785, 796 (7th Cir. 2021). If they were not, then the analysis ends. If the remarks "violated one of the defendant's specific trial rights, such as the Fifth Amendment right against self-incrimination, then the court may hold the error harmless and uphold the conviction only if the government proves beyond a reasonable doubt that the defendant would have been convicted absent the unconstitutional prosecutorial comments." *United States v. Wesley*, 422 F.3d 509, 515 (7th Cir. 2005) (quotation marks omitted). If the remarks were improper without violating a specific constitutional violation, then the court considers instead whether, in light of the record as a whole, the defendant was deprived of a fair trial. *Id.*[4]

---

[4] The Government seems to argue that even if a prosecutor made a comment that violated a defendant's Fifth Amendment right to remain silent, to determine whether the error was prejudicial, the court simply considers whether, in the context of the entire record, the defendant was deprived of a fair trial. *See* Resp. Am. Mot. 14–16. This does not comport with the standard identified in *Wesley*. But the Court recognizes that there are Seventh Circuit cases that seem to support what the Government says. *See Carswell*, 996 F.3d at 796 (stating, in a case where the defendant argued that the prosecution commented on his decision not to testify, that to evaluate a claim of prosecutorial misconduct the court considers whether the defendant was deprived of a fair trial). But the *Carswell* court found no violation of the Fifth Amendment right against self-incrimination, *id.* at 798, so it had no opportunity to consider what showing of prejudice was actually necessary to obtain relief for such a violation. Nothing suggests

"The Fifth Amendment protects a defendant's right against compelled self-incrimination by permitting a defendant to refuse to testify at trial." *Carswell*, 996 F.3d at 796. "The corollary of that protection is that a prosecutor may not make comments, either directly or indirectly, that invite the jury to infer guilt from the defendant's decision not to testify." *Id.* An indirect comment on a defendant's failure to testify "will be deemed improper only if the prosecutor's manifest intent was to use the defendant's silence as evidence of guilt, or if the jury would naturally and necessarily infer guilt from the comment." *Id.* at 797 (quotation marks omitted). A prosecutor improperly comments on a defendant's failure to testify if she notes "the absence of a particular category of potential defense evidence when the *only* source of the potential evidence would have been the defendant himself," *id.*, or if she comments that "the government's evidence on an issue is uncontradicted, undenied, unrebutted, undisputed, etc. . . . if . . . the only person who could have contradicted, denied, rebutted, or disputed the evidence was the defendant," *United States v. Aldaco*, 201 F.3d 979, 987 (7th Cir. 2000) (quotation marks omitted).

The Court does not find that either of the remarks violated Williams's Fifth Amendment right to remain silent. The transcript does not support finding that the prosecutor had a manifest intent to use Williams's failure to testify as evidence of guilt. Assistant United States Attorney ("AUSA") Ryan Finlen gave the Government's initial closing argument, and AUSA Elly Pierson gave the rebuttal, which is when the allegedly improper remarks were made. AUSA Finlen argued that the tangible evidence in the case was impossible to ignore, including the fact that Coleman's stolen phone ended up in the Monte Carlo that Williams was driving. *See* Trial Day 3

---

to the Court that the less onerous showing of prejudice necessary for violations of a specific trial right like the Fifth Amendment right against self-incrimination identified in *Wesley*, which relies on *United States v. Mietus*, 237 F.3d 866, 870 (7th Cir. 2001), is not good law anymore.

9

Tr. 141:17–24. The gist of Rumley's closing argument was that other than testimony of his alleged accomplices, who had motive to lie to get a benefit on their sentences, there was no evidence tying Williams to the robbery. *See, e.g.*, *id.* at 157:9–19 ("You've seen, since Tuesday, twenty people come and take the oath to tell the truth . . . . Two witnesses would say they saw . . . Williams in Champaign on July 28th of 2018. . . . It was Thomas, and it was Jaevontae."); *id.* at 160:12–14 ("And would you believe there's not a shred of evidence – not one thing – in that car that came back to Randy Williams? Amazing."); *id.* at 164:16–19 ("You saw a number of witnesses who can't lay a glove on Randy Williams, who can't say where he was at any given time on the night he's supposed to be out committing a felony with these other guys."). All Rumley said about Coleman's phone was that "the only thing really significant" about the Monte Carlo being pulled over was that "the car was inventoried in preparation for a tow, and they did find . . . Coleman's cell phone in between the seats of the vehicle" but that "they also found that Randy Williams had a cell phone in his possession at that time." *Id.* at 162:1–8.

In rebuttal, AUSA Pierson sought to push back on Rumley's argument that there was no evidence tying Williams to the crime. In full context, the first allegedly improper statement was:

> It also is interesting to me that Mr. Rumley ignores what is the most common sense explanation and the strongest tie in this case. If there's a smoking gun here, ladies and gentlemen, it's Government's Exhibit 11. There's no explanation for why this phone is next to that man less than an hour from the robbery. No explanation for that.

*Id.* at 172:6–12. She identified a potential explanation Williams could have given for being in the Monte Carlo with Coleman's phone—he could have said that he got picked up by Jaevontae after the robbery. *Id.* at 173:23–174:1. But she noted that the Government's cell site data evidence refuted that there had been a detour to pick someone up. *Id.* at 174:1–5. AUSA Pierson argued that it was not a coincidence that "Coleman's phone and the disguises with the

10

DNA of the robbers were left behind in the Monte Carlo that [Williams] was arrested in." *Id.* at 174:6–9. She concluded her rebuttal by stating again: "If there was any legitimate explanation for why this phone was next to this man an hour from the robbery, you would have heard it. Find him guilty." *Id.* at 175:6–9. Read in context, AUSA Pierson was primarily commenting on Rumley's argument that there was no evidence tying Williams to the crime, not on Williams's failure to testify.

A jury would not naturally and necessarily understand the comments as commenting on Williams's silence either. Even if the statements should be understood as equivalent to saying that there was an absence of evidence from the defense or that the Government's evidence was undisputed, Williams was not the only person who could have provided disputing evidence. Like the Government suggested, Williams's alleged accomplices would have been able to testify that Williams was picked up after the robbery, if that were true. Williams's whereabouts would not have been known to him alone. And if there were an innocent explanation for why Coleman's phone was in the car, any of Williams's alleged accomplices would have been able to provide such an explanation. Moreover, the Monte Carlo was registered in the name of Cieara Wilson, Trial Day 3 Tr. 9:8–20, and was bought by Jaevontae and his brother Tavaris Thomas, *id.* at 9:1–7. Any of those people could have provided an explanation of how the phone got into the car, if not because it was stolen from the Sprint store.

The Seventh Circuit has recognized that the availability of other witnesses to testify about a particular issue, even alleged accomplices, means that a statement that evidence is undisputed is not improper. *See Aldaco*, 201 F.3d at 988 ("Where, as in this case, the defendant's three accomplices were available to rebut the officer's allegation that Aldaco possessed the gun, the prosecutor's statement that the evidence was 'undisputed' was not improper."); *United States v.*

11

*Mietus*, 237 F.3d 866, 872 (7th Cir. 2001) (holding that a prosecutor's remark that the jury "didn't hear any testimony that the defendants rushed to repair [a] refrigeration unit as soon as they arrived at [a] garage" was not improper because one of the defendants did testify and "could have provided testimony about what happened at the garage" (quotation marks omitted)); *United States v. Tanner*, 628 F.3d 890, 900 (7th Cir. 2010) ("Tanner was accused of having sold drugs not on his own, but as part of a large conspiracy. The possibility that even one of his alleged co-conspirators might have testified on his behalf is enough to dispel any constitutional concerned.") This remains trues even if it is "possible, even likely," that those witnesses would not be "willing and able to testify on [the defendant's] behalf." *Tanner*, 628 F.3d at 900. The relevant question is whether the defendant would be the only person that *could* rebut the evidence. *Id.* Here, there are a number of people who could have provided evidence to explain why Coleman's phone was in the Monte Carlo or to show how Williams could have been pulled over the in car with the stolen phone without having been involved in the robbery—"if there had been a factual basis for it." *See id.* A juror would not naturally understand the prosecutor's comments to be an invitation to infer guilt from Williams's failure to testify.

The Court need not decide whether Rumley performed deficiently by not objecting to the statements. There was no Fifth Amendment violation, so there was no prejudice from Rumley's failure to object to the two statements.

### c. Impeaching Jaevontae with Thomas James's Testimony

Williams's third argument is that Rumley was ineffective because he failed to cross-examine Jaevontae about James's conflicting testimony. Am. Mot. 11–15.[5] The Government

---

[5] Presumably Williams's reference to impeachment in the section header, Am. Mot. 11, means only impeachment in the general sense of "attack[ing] the witness's credibility," Fed. R. Evid. 607. It would not be proper to impeach Jaevontae with another witness's prior inconsistent statement.

12

argues that Williams cannot establish that he received ineffective assistance of counsel because Rumley did engage in "extensive cross-examination" with Jaevontae, Rumley spent "much of his closing argument challenging" Jaevontae and James's credibility, and more aggressively challenging the minor conflicting details between their stories would not have affected the jury's verdict. *See* Resp. Am. Mot. 19–20.

James testified on the second day of trial and Jaevontae testified on the third day. They each testified about the events leading up to, during, and after the robbery. As Williams notes, James's and Jaevontae's stories differ in three respects. *See* Am. Mot. 14. First, the location where the robbers met before heading to the Sprint store: James testified that a man named Andre Williams picked him up, brought him back to Andre's house, and then James, Nunn, and Andre met Jaevontae and Williams at Jaevontae's house, *see* Trial Day 2 Tr. 109:7–20; *id.* at 112:11–22; *id.* at 115:9–10; Jaevontae testified that he, Andre, Nunn, James, and Williams met at "Marathon gas station in Kankakee, Illinois" prior to the robbery, Trial Day 3 Tr. 10:21–23; *id.* at 11:22–12:3. Second, who drove Jaevontae to Champaign: James testified that Williams drove himself, Nunn, and James to Champaign in the Monte Carlo while Andre drove Jaevontae to Champaign in a black SUV, Trial Day 2 Tr. 118:6–15; Jaevontae testified that Williams drove him to the gas station in Kankakee while Andre drove Nunn and James to the gas station, that after getting gas, they all drove down to a parking lot in Champaign, that in the parking lot, he got into the black SUV, and that Williams drove James and Nunn to the Sprint store in the Monte Carlo and he and Andre circled the area in the black SUV, Trial Day 3 Tr. 11:1–4; *id.* at 12:1–3; 15:13–16:16. And third, who transferred a bag of phones from the backseat of the Monte Carlo to the black SUV after the robbery: James testified that it was him, Trial Day 2 Tr. 126:14–15; Jaevontae testified that it was Nunn, *see* Trial Day 3 Tr. 17:21–18:2.

13

"[D]eciding what questions to ask a prosecution witness on cross-examination is a matter of strategy." *United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008). To show that counsel's cross-examination was deficient under the first prong of the *Strickland* test, a defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rodriguez*, 53 F.3d 1439, 1448 (7th Cir. 1995) (quotation marks omitted). And to show prejudice, the defendant must "explain[] . . . what [the witness's] responses to further cross-examination might have revealed" and "how those responses might have affected the result." *Id.* at 1449.

Williams has not overcome the strong presumption that Rumley's conduct was reasonable. He argues that "there is no strategic reason to refrain from cross-examining Jaevontae" about the differences between his and James's testimony. Am. Mot. 14. This is so, according to Williams, because if Jaevontae had changed his testimony to match James's story then he would lose credibility and if he stood by his story, then it would be clear to the jury that either he or James was lying. *Id.* But the record demonstrates that rather than focus on minute differences in testimony, Rumley decided to focus on challenging James's and Jaevontae's credibility by pointing out that they were looking for a reward for their testimony in the form of a lesser sentence. *See, e.g.*, Trial Day 2 Tr. 135:1–3 (asking James: "And by your appearance today and your testimony here today, you expect . . . to get a break in your sentence?"); Tr. Trial Day 3 Tr. 29:10–11 (asking Jaevontae: "You're testifying here today, hoping to get a downward departure; is that right?"); *id.* at 165:20–166:3 ("Now, the two felons. Obviously, the government is desperate to have them here. They persuaded them to get here. They offered them cooperation agreements and the promise of a possibility of an improvement in the sentence."). The Court will not find that counsel's performance was constitutionally deficient

14

when he did in fact cross-examine the witnesses with the intent to discredit them simply because Williams wishes he would have cross-examined them in a different way. *See Rodriguez*, 53 F.3d at 1448 ("Based on his trial counsel's cross-examination of [the witness, in which he attempted to challenge her recollection, motivation for testifying, and her ability to recognize the defendant], we refuse to conclude that the defendant's attorney's performance fell below par.").

Even assuming Williams could establish deficient performance, he cannot establish that there is a reasonable probability that further cross-examination of Jaevontae to point out how his and James's stories differed would have changed the outcome of the trial. He can only speculate about how Jaevontae would have responded to such questions. Moreover, the inconsistencies were about fairly minor details and not specifically about Williams's role in the crime. Given the other evidence in the case—that Williams was found in the Monte Carlo that was seen at the scene of the crime, with a phone that was stolen from a victim in the robbery—exploiting minor inconsistencies like Williams has identified would not have changed the jury's verdict. *See United States v. Wilson*, 210 F.3d 377, 377 (7th Cir. 2000) (Table) ("It is certainly not inconceivable that counsel, for tactical reasons, did not [exploit minor inconsistencies in certain witnesses' testimony] . . . . [I]f, by chance, it could be said that counsel fell a little short on his obligations to pursue these 'weaknesses' . . . , counsel's deficiencies could not be branded as anything more than harmless based on the strength of the government's case.").

### d. Impeaching Flaws in Jaevontae's Testimony

Williams's last argument is that Rumley provided ineffective assistance of counsel because he failed to use "blatant flaws" in Jaevontae's testimony to discredit him. Am. Mot. 15–16–17. The "blatant flaw" he is referring to is that Jaevontae first answered the Government's question about what his role was in the robbery by saying that he was "a driver," Trial Day 3 Tr.

15

5:9–11, but when the Government asked for clarification, he said that he was "[a] driver, the passenger," *id.* at 5:13, and then later he testified that that Andre drove the black SUV and Williams drove the gray Monte Carlo, *id.* at 5:21–6:4. Williams argues that "[a]ny reasonable attorney would have emphasized in his cross-examination that Jaevontae . . . admitted to being a driver." Am. Mot. 17.

This claim fails for the same reason as the last one. Rumley chose to focus on cross-examining Jaevontae on whether he had a motive to lie due to his cooperation. Williams does not rebut the presumption that this was a reasonable strategic choice. Moreover, it is not even clear that Jaevontae changed his testimony. It appears that he meant his role was to be in one of the getaway cars rather than going into the store to commit the robbery, which is consistent with the rest of his testimony. Williams's argument that asking Jaevontae about the two very brief references to him being a driver on cross-examination could have changed the outcome of the trial is mere speculation. *See, e.g.*, *id.* at 17–18 (arguing that "[a] juror may even think Jaevontae . . . –not Defendant—was driving the Monte Carlo at the time of the robbery"). This is not sufficient to show prejudice under *Strickland*.

### III.  Evidentiary Hearing

The court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the . . . record[] . . . conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). This means that "a district court must grant an evidentiary hearing when the [prisoner] alleges facts that, if proven, would entitle him to relief." *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006) (emphasis and quotation marks omitted). Williams does not allege facts that, if proven, would entitle him to relief. Accordingly, no evidentiary hearing is required.

IV.     **Certificate of Appealability**

When a district court enters a final order adverse to an applicant, it must issue or deny a certificate of appealability. Rule 11(a), Rules Governing § 2255 Proceedings. A court can grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Williams has not made a substantial showing of the denial of a constitutional right, so the Court declines to issue a certificate of appealability.

## CONCLUSION

Accordingly, Defendant-Petitioner Randy Williams's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, ECF No. 86, is MOOT IN PART. The Amended Motion to Set Aside Conviction Pursuant to 28 U.S.C. Section 2255 and Memorandum of Law in Support, ECF No. 123, is DENIED. The Clerk is directed to enter judgment on the 2255 proceeding—indicating that Williams's original motion under 28 U.S.C. § 2255 is DENIED IN PART and MOOT IN PART and his amended § 2255 motion is DENIED—and close the accompanying civil case, No. 2:21-cv-02033.

Entered this 31st day of March, 2025.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

17